WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Janine Dehart,

          Plaintiff,

v.

Johnson & Johnson, et al.,

          Defendants.

No. CV-20-02493-PHX-DWL

**ORDER**

Pending before the Court is a motion to dismiss filed by Defendants Johnson & Johnson and Ethicon Incorporated (collectively, "Defendants").  (Doc. 16.)  For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

I.   <u>Procedural History</u>

On December 29, 2020, Plaintiff Janine Dehart ("Dehart") initiated this action by filing the complaint.  (Doc. 1.)

On April 5, 2021, Dehart filed her operative pleading, the First Amended Complaint ("FAC").  (Doc. 15.)[1]

On April 19, 2021, Defendants moved to dismiss the FAC.  (Doc. 16.)  Afterward, the motion became fully briefed (Docs. 17, 19), Defendants belatedly filed the required certificate of conferral (Doc. 18), and the parties filed dueling notices of supplemental

---

[1]   The original complaint named another plaintiff in addition to Dehart, but this co-plaintiff was eliminated in the FAC.

1   authority (Docs. 23, 24).[2]

2   II.    <u>Factual Background</u>

       This is one of many similar cases around the country involving allegations of defects in pelvic mesh products developed by Defendants.[3]  The following facts, taken as true, are derived from the FAC.

       On June 15, 2009, Dehart "was implanted with an Ethicon Gynecare TVT-S pelvic mesh product" ("TVT-S"), which was developed, manufactured, promoted, and sold by Defendants.  (Doc. 15 ¶¶ 2, 5-7.)  Dr. Lee Koon ("Dr. Koon") performed the procedure at Banner Thunderbird Medical Center in Glendale, Arizona.  (*Id.* ¶ 2.)  Dehart "subsequently developed complications arising from the implant of the Ethicon pelvic mesh product, including mesh implant complications necessitating removal, pelvic and rectal pain, dyspareunia, vaginal discharge, difficulty voiding, worsening stress urinary incontinence, and stress and anxiety."  (*Id.* ¶ 4.)

       Based on these background factual allegations, as well as many additional factual allegations that are discussed in more detail below, the FAC asserts 13 claims.  (Doc. 15 ¶¶ 77-314.)

## DISCUSSION

I.    <u>Legal Standard</u>

       "[T]o survive a motion to dismiss under Rule 12(b)(6), a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation

---

[2]    Defendants requested oral argument, but this request is denied because the matter is fully briefed and oral argument will not aid the decisional process.  *See* LRCiv 7.2(f).

[3]    *See* https://www.wvsd.uscourts.gov/caselist/caseviewlist.aspx?mdl=2327.

first and third elements.  (Doc. 16 at 2-5.)  Specifically, Defendants argue that Count II is subject to dismissal because (1) it contains "only vague and conclusory allegations" concerning "the alleged design of pelvic mesh products, generally" and lacks any "allegations about the specific design of TVT-S"; and (2) "pleads no facts whatsoever that would plausibly link [Dehart's] injuries to the alleged defect(s)," such as "facts to differentiate her injuries" from "an injury that is consistent with any SUI surgery and that was an expected risk of TVT-S surgery." (*Id.*)  Defendants also attempt to liken this case to *Baca v. Johnson & Johnson*, 2020 WL 6450294 (D. Ariz. 2020), where the design-defect allegations in a different pelvic mesh lawsuit were deemed deficient.  (*Id.* at 4-5.)

Defendants' arguments are unavailing.  Count II of the FAC alleges that TVT-S's design is marred by at least 13 specific defects that render it unreasonably dangerous: (1) "the use of polypropylene material in the TVT-S product and the immune reaction that results from such material, causing adverse reactions and injuries"; (2) "the design of the TVT-S product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries"; (3) "biomechanical issues with the design of the TVT-S product, including, but not limited to, the propensity of the TVT-S product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury"; (4) "the use and design of arms or anchors in the TVT-S product, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region"; (5) "the propensity of the TVT-S product for migration or to gradually elongate and deform when subject to prolonged tension inside the body"; (6) "the inelasticity of the TVT-S product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis"; (7) "the propensity of the TVT-S product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time"; (8) "the hyper-inflammatory responses to collagen leading to problems

including chronic pain and fibrotic reaction"; (9) "the propensity of the TVT-S collagen product to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions"; (10) "the adverse tissue reactions caused by the TVT-S collagen product, which is causally related to infection, as the collagen is a foreign organic material"; (11) "the harshness of collagen upon the female pelvic tissue, and the hardening of the TVT-S product in the body"; (12) "the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the TVT-S mesh is implanting according to Defendants' instructions"; and (13) "the propensity of the TVT-S product to cause chronic injuries and degrade, oxidize, stiffen, harden, migrate, cord, fray, curl, lose particles, corrode, and/or otherwise deform."  (Doc. 15 ¶ 100.)  Drawing all reasonable inferences in Dehart's favor, as the Court must at this stage, the FAC plausibly alleges a design defect in TVT-S (as opposed to a generic design defect that exists generically in pelvic mesh devices).

Nor is there any merit to Defendants' challenge to the FAC's causation-related allegations.  The FAC alleges that Dehart "was implanted with an Ethicon Gynecare TVT-S pelvic mesh product"; that Dehart "subsequently developed complications arising from the implant of the Ethicon pelvic mesh product, including mesh implant complications necessitating removal, pelvic and rectal pain, dyspareunia, vaginal discharge, difficulty voiding, worsening stress urinary incontinence, and stress and anxiety"; that Defendants' TVT-S products are known to cause patients to experience severe immune response, foreign body reaction, chronic inflammatory response, chronic pain, and fibrotic reaction; that Dehart would not need to undergo a revision procedure if the TVT-S implanted in her did not exhibit the described defective propensities; and that "[t]he specific defects of the TVT-S device [Dehart] was implanted with are the direct and proximate causes (or are specifically linked) of her injuries, as described herein."  (Doc. 15 ¶¶ 2, 4, 15-17, 103-104.)  Such detailed allegations are sufficient, at the pleading stage of the case, to plausibly establish a causal connection between the alleged design defects of TVT-S and the injuries that Dehart sustained following her TVT-S implant surgery.

The presence of such detailed allegations also distinguishes this case from *Baca*. There, although the complaint generically alleged that "a large subset of the population" suffered an adverse immune response after receiving the product, it did not actually allege that "*Plaintiff* suffered from an adverse immune response or otherwise describe how the Product implanted in Plaintiff failed." 2020 WL 6450294 at *4 (emphasis added). Accordingly, the court concluded that the complaint "simply fail[ed] to show how the Product caused *this* Plainiff's specific injury." *Id.* Here, the FAC contains the factual allegations that were missing in *Baca*—it specifically alleges that Dehart "subsequently developed" the very sort of complications that TVT-S products are known to cause in the greater population.

For these reasons, Defendants' motion to dismiss Count II is denied.

### 2.   Manufacturing Defect

Count III of the FAC asserts a claim for "Strict Liability—Manufacturing Defect." (Doc. 15 ¶¶ 108-18.)  "In Arizona, the crux of a manufacturing defect claim is that the defective product differs from the manufacturer's intended design or from other ostensibly identical units of the same product line." *Baca*, 2020 WL 6450294, *4 (citation omitted). "A plaintiff pursuing a manufacturing defect claim must identify or explain how the product either deviated from the manufacturer's intended result or how the product deviated from other seemingly identical models; thus, a bare allegation that the product had a manufacturing defect is an insufficient legal conclusion." *Id*. at 5 (citation omitted).

Defendants seek dismissal of Count III on two grounds: (1) although the FAC alleges in conclusory fashion that the product implanted in the Plaintiff "deviated materially from Defendants' design and manufacturing specifications," it "does not allege *how* her TVT-S deviated from Ethicon, Inc.'s design and manufacturing specifications such that it was different than other TVT-Ss that were manufacturer and such that it was different than intended"; and (2) the allegations of causation related to the manufacturing defect claim are deficient for the same reasons as the causation allegations related to the design defect claim.  (Doc. 16 at 5-6.)

The Court agrees with Defendants that the FAC's allegations of a manufacturing defect are too conclusory to survive dismissal.  In paragraph 109, the FAC alleges as follows: "The TVT-S product implanted in the Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law with respect to its manufacture, in that it deviated materially from Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to the Plaintiff."  This allegation is deficient because it doesn't explain *why* there was a deviation—it doesn't, for example, identify the design and manufacturing specifications that Defendants were supposed to follow and then identify a specific way in which the device that was implanted in Dehart deviated from those standards.

In response to Defendants' arguments on this point, Dehart seems to acknowledge (or, at least, doesn't dispute) that the FAC fails to identify and allege a specific manufacturing defect—instead, her position seems to be that it is unnecessary for a plaintiff asserting a manufacturing-defect claim to provide such allegations at the pleading stage because doing so is too difficult.  (Doc. 17 at 4-5.)  Although Dehart identifies several district court decisions from outside the Ninth Circuit that seem to have reached that conclusion, the Court is not convinced such an approach is correct.  To avoid dismissal, Dehart must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  This requires "more than a sheer possibility that a defendant has acted unlawfully," and if "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (citations and quotation marks omitted).  Here, the FAC's allegations raise, at most, a "sheer possibility" that there was a manufacturing defect (as contrasted with a design defect) in the TVT-S device that happened to be implanted in Dehart, so Defendants' motion to dismiss Count III is granted.[4]

---

[4]     Dehart also contends that a manufacturing defect claim can be based on "inadequate testing" (Doc. 17 at 5), but Dehart cites no Arizona cases following this approach, which would seem to collapse the distinction between manufacturing and design defect claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   Failure To Warn

Count IV of the FAC asserts a claim for "Strict Liability—Failure To Warn." (Doc. 15 ¶¶ 119-47.)  Under Arizona law, the elements of such a claim are "(1) [the defendant] had a duty to warn . . . ; (2) the missing warning made the product defective and unreasonably dangerous; (3) the warnings were missing when the [product] left [the defendant's] hands; and (4) [the] failure to warn . . . caused [the plaintiff's] injuries." *Sw. Pet Prods., Inc. v. Koch Indus., Inc.*, 273 F. Supp. 2d 1041, 1060 (D. Ariz. 2003) (citing *Gosewisch v. Am. Honda Motor Co., Inc.*, 737 P.2d 376, 379 (Ariz. 1987) (superseded on other grounds by A.R.S. § 12-2505)).  Arizona also follows the "learned intermediary doctrine," under which a medical device manufacturer satisfies its duty to warn patients of the foreseeable risks involved with its products if it provides a complete, accurate, and appropriate warning to the patient's health-care provider. *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 949 (Ariz. 2016) (adopting the Restatement (Third) of Torts § 6(d)).  Thus, "the focus of [such a] failure to warn claim is on what Defendants told the health-care provider and whether inadequacies in those warnings caused Plaintiff's injuries." *Baca*, 2020 WL 6450294 at *6 (citation omitted).

Defendants seek dismissal of Count IV on two grounds: (1) the FAC "fails to adequately plead how TVT-S's warning were inadequate because it does not state specifically what warnings were contained in that product's packaging"; and (2) the FAC "does not plead sufficient facts that would plausibly show how [Dehart's] injuries were proximately caused by any alleged deficiencies in the warnings" because it does not, for example, "allege facts that would show how the implanting surgeon acted in reliance on deficiencies in [the] warnings or how (if at all) he would have acted differently if different warnings had ben provided."  (Doc. 16 at 7-9.)

Defendants' first challenge lacks merit.  The FAC includes a list of 21 specific warnings that Defendants allegedly should have provided.  (Doc. 15 ¶ 121.)[5]  The FAC

---

[5]     The list includes "the risk of chronic inflammation resulting from the TVT-S products; [ ] the risk of chronic infections resulting from the TVT-S products; [ ] the risk of permanent vaginal or pelvic scarring as a result of the TVT-S; [ ] the risk of de novo urinary dysfunction; [ ] the risk of de novo dyspareunia or painful sexual relations; [ ] the

also specifically alleges that the instructions that *were* provided by Defendants—specifically, "Instruction for Use ('IFU') and pamphlets or commercial documents for the TVT-S product"—failed to "disclose the above-referenced risks, adverse events, and contraindications." (*Id.* ¶ 128.) Thus, even though the FAC doesn't specifically allege the content of the warnings that were provided by Defendants, it sufficiently alleges the existence of a missing warning that rendered the product defective and unreasonably dangerous.

Defendants' causation-related challenge fails, too. Under Arizona law, "[a] plaintiff may show that the injury proximately resulted from the failure to warn, or from an inadequate warning, by evidence that had a proper warning been given, he would not have used the product in the manner which resulted in his injury, or by evidence that certain precautions would have been taken that would have avoided the accident." *Gosewisch*, 737 P.2d at 379. Here, the FAC specifically alleges that, had the additional warnings been provided, Dr. Koon would have conveyed them to Dehart and Dehart would have declined to consent to the surgery. (Doc. 15 ¶ 134 ["Plaintiff's implanting physician would have conveyed the above-referenced information to Plaintiff during his consent processes for the TVT-S . . . [and] Plaintiff would not have consented to having the TVT-S device implanted in her if she was informed of all known relevant risks, adverse events, and contraindications of this device."].) Such allegations are sufficient to plausibly establish proximate causation with respect to the failure-to-warn claim.

### 4. Breach Of Implied Warranty

Count VII of the FAC asserts a claim for "Strict Liability—Breach of Implied Warranty." (Doc. 15 ¶¶ 185-97.) Defendants seek dismissal of this claim on two grounds: (1) it "is not permitted by Arizona law"; and (2) it is barred by the applicable statute of limitations. (Doc. 16 at 10-11.)

---

risk of recurrent, intractable pelvic pain and other pain resulting from the products; [ ] the need for corrective or revision surgery to adjust or remove the products which in some cases is not feasible nor possible; [and] the severity of complications that could arise as a result of implantation of the products[.]"

1    The Court agrees with the first argument and thus need not reach the second.

2    "[U]nder Arizona law, 'the theory of liability under implied warranty has been merged into

3    the doctrine of strict liability.'" *D'Agnese v. Novartis Pharms. Corp.*, 952 F. Supp. 2d 880,

4    890 (D. Ariz. 2013) (quoting *Scheller v. Wilson Certified Foods, Inc.,* 559 P.2d 1074, 1076

5    (Ariz. Ct. App. 1976)).  *See also  Gebhardt v. Mentor Corp.*, 191 F.R.D. 180, 185-86 (D.

6    Ariz. 1999) ("Arizona has merged breach of implied warranty claims with strict liability

7    claims.  Because Plaintiff cannot prevail on the strict liability claims, the Court will also

8    grant summary judgment in favor of Defendants and against Plaintiff on Plaintiff's breach

9    of warranty claims.") (citation omitted).  Thus, Count VII is subject to dismissal.  *Allstate*

10   *Ins. Co. v. Ford Motor Co.*, 2009 WL 10673457, *2 (D. Ariz. 2009) ("Because the implied

11   warranty claim unnecessarily duplicates the strict liability claim and merges with the strict

12   liability claim under Arizona law, it should be dismissed.").

13   *Ramirez v. Medtronic Inc.*, 961 F. Supp.2d 977 (D. Ariz. 2013), which Dehart cites

14   in response to Defendants' first dismissal argument (Doc. 17 at 9), does not compel a

15   different conclusion—it discusses the contours of a claim for breach of an *express*

16   warranty, which differs from the sort of *implied* warranty claim at issue in Count VII.

17   Accordingly, Count VII is dismissed.

18   **B.    Negligence-Based Claims**

19   The FAC includes claims for negligence (Count I) and negligent infliction of

20   emotional distress ("NIED") (Count X).

21   1.    Negligence

22   Count I of the FAC asserts a claim for "Negligence."  (Doc. 15 ¶¶ 77-97.)  The sole

23   ground on which Defendants seek dismissal of this claim is that it is "duplicative of, and

24   subsumed by, the strict liability claims."  (Doc. 16 at 9.)  Dehart disagrees, arguing that,

25   under Arizona law, a plaintiff's "general negligence claim is not subsumed by [a] strict

26   liability claim[]."  (Doc. 17 at 7-8 & n.2.)

27   Defendants have the better side of this argument, at least under the circumstances

28   of this case.  The starting point for the analysis is *Dart v. Wiebe Mfg., Inc.*, 709 P.2d 876

- 10 -

(Ariz. 1985).  There, the plaintiff "brought an action with separate counts of negligence and strict liability for [an] alleged design defect" against a product manufacturer.  *Id.* at 877.  At trial, the "judge refused to give the separate instructions which plaintiff offered on each of these theories; instead, he gave a single instruction to cover both of them."  *Id.*  The plaintiff objected on the ground that the trial court's approach "effectively deprived him of his strict liability, design defect claim" and the Arizona Supreme Court agreed, finding that the trial court committed reversible instructional error.  *Id.* at 877, 884.  In the course of its analysis, the court emphasized that "there is a fundamental difference in the application of a risk/benefit analysis in a negligent design case and the same analysis in a strict liability design case. The difference is significant, for it shifts the central focus of the inquiry from the conduct of the manufacturer (negligence) to the quality of the product (strict liability)."  *Id.* at 880 (emphasis omitted).  The court elaborated that "[t]he true distinction . . . between negligent design cases applying the risk/benefit analysis and strict liability cases applying the same word formulation is the time frame in which this determination is made"—in negligence actions, the reasonableness of the manufacturer's conduct is assessed "at the time of manufacture or design of the product," whereas in a strict liability action, "the quality of the product may be measured not only by the information available to the manufacturer at the time of design, but also by the information available to the trier of fact at the time of trial."  *Id.* at 880-81.  *See also id.* at 881-82 ("In a negligence case, the inquiry focuses on the reasonableness of the manufacturer's choice of design in light of the knowledge available at the time of manufacture.  Under strict liability, however, knowledge of the 'danger in fact' as revealed by the accident and the testimony at trial is imputed to the manufacturer.").

At first blush, *Dart* might seem to support Dehart's position that she should be allowed to pursue alternative theories of negligence and strict liability in this action.  After all, *Dart* took pains to note that the two theories have "significant" and "fundamental" differences.  But notwithstanding that language, it is notable that the *Dart* emphasized that a claim for strict liability is, in the final analysis, similar to (but easier from the plaintiff's

perspective to prove than) a claim for negligence.  Thus, although it may have been error in *Dart* to instruct the jury in a manner that "effectively deprived [the plaintiff] of his strict liability, design defect claim," it doesn't necessarily follow that it would be error to require a plaintiff pursuing a product liability claim to proceed solely under a strict liability theory (which is the approach Defendants advocate here).

Two years after *Dart* was decided, the Arizona Court of Appeals decided *Gomulka v. Yavapai Mach. & Auto Parts, Inc.*, 745 P.2d 986 (Ariz. Ct. App. 1987).  There, the plaintiff in "a products liability case" claimed that a product "was defective and that the seller was liable under theories of strict liability and negligence."  *Id.* at 988.  The trial court granted summary judgment in the manufacturer's favor as to both theories but the appellate court reversed, holding that the plaintiff's proffered evidence concerning his strict liability claim was sufficient to create a triable issue of fact.  *Id.* at 989-90.  Significantly, the appellate court then held that it was unnecessary to review the trial court's grant of summary judgment "on the issue of negligent design" because if the plaintiff "cannot prove his case in strict liability, he cannot prove it in negligence either.  This is true because if [plaintiff] were to proceed on a negligence theory he would have to prove everything he would need to prove under a strict liability theory plus he would have to prove that the defendant knew or should have known that the [product] was unnecessarily dangerous.  *The count for negligence is therefore redundant*."  *Id.* at 990 (emphasis added).  Defendants proffer *Gomulka* as the key Arizona case supporting their request for dismissal of Dehart's negligence claim on redundancy grounds, and the Court agrees that *Gomulka* supports a finding of redundancy in these circumstances.

So, too, does § 2 of the Restatement (Third) of Torts.  *See generally In re Krohn*, 52 P.3d 774, 779 (Ariz. 2002) ("We have long followed the rule that where not bound by our previous decisions or by legislative enactment, we would follow the Restatement of the Law.") (cleaned up).  Comment n to § 2 cautions against allowing a case to "be submitted to a jury on multiple theories of recovery," because "to allow two or more factually identical risk-utility claims to go to a jury under different labels, whether 'strict liability,'

'negligence,' or 'implied warranty of merchantability,' would generate confusion and may well result in inconsistent verdicts." Additionally, although comment n explains that a finding of redundancy may not be warranted "for claims based on manufacturing defects, since [a strict liability manufacturing defect claim] does not require risk-utility assessment while a negligence claim does," here the Court has already determined that Dehart's manufacturing defect claim is subject to dismissal. Thus, unless Dehart can identify some reason to question whether *Gomulka* and the Restatement (Third) provide an accurate prediction of how the Arizona Supreme Court would decide the issue of redundancy in this case, Count I must be dismissed. *See generally In re Kirkland*, 915 F.2d 1236, 1238-39 (9th Cir. 1990) ("When interpreting state law, a federal court is bound by the decision of the highest state court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance. However, in the absence of convincing evidence that the highest court of the state would decide differently, a federal court is obligated to follow the decisions of the state's intermediate courts.") (citations and internal quotation marks omitted).

The two cases cited by Dehart, *Golonka v. Gen. Motors Corp.*, 65 P.3d 956 (Ariz. Ct. App. 2003), and *Granillo v. Johnson & Johnson*, 2020 WL 913300 (D. Ariz. 2020), are insufficient to raise such doubts. In *Golonka*, the plaintiffs in a products liability action were allowed to pursue claims for negligence and strict liability at trial and the jury returned a mixed verdict, finding for the plaintiffs on their claims for "negligent failure to warn," "negligent design," and "strict liability information defect" but for the defendant on the claim for "strict liability design defect." 65 P.3d at 960, 974. Afterward, the defendant moved for judgment notwithstanding the verdict on the ground that "the jury necessarily rejected Plaintiffs' theory of negligent design because it found GM not at fault on the strict products liability claim that was based on defective design." *Id.* at 961. On the one hand, the appellate court agreed with the defendant that "when a plaintiff's claims for strict liability design and negligent design are factually identical, and the jury employs a

risk/benefit analysis to determine that the manufacturer is not at fault for strict liability design, the jury cannot consistently find the product manufacturer at fault for negligent design." *Id.* at 965.  *See also id.* at 965 n.3 ("[C]ourts from other jurisdictions and commentators have opined that a jury cannot under any circumstances consistently reject a strict liability design claim and accept a negligent design claim.").  On the other hand, the appellate court noted that the plaintiffs' negligence claim was not based solely on a negligent design theory—it was also predicted on a failure-to-warn theory—and thus the defense verdict on the "strict liability design defect" claim was not necessarily inconsistent with the verdict in the plaintiffs' favor on the negligence claim.  *Id.* at 965-66.

Although Dehart views *Golonka* as a case affirmatively authorizing a plaintiff in a product liability action to pursue alternative negligence and strict liability theories at trial, the Court does not share this interpretation.  Admittedly, the plaintiffs in *Golonka* were allowed to pursue such theories at trial, but the appellate court in *Golonka* wasn't asked to decide (and didn't decide) whether this was a permissible pleading and instructional approach.  Instead, the narrow issue presented in *Golonka* was whether a defense verdict on a "strict liability design defect" claim compelled the entry of judgment in the defendant's favor where the jury ruled in the plaintiff's favor on a different strict liability theory (*i.e.,* "strict liability information defect") as well as on two negligence theories (*i.e.,* "negligent design" and "negligent failure to warn").  *Golonka*'s refusal to grant judgment notwithstanding the verdict under those circumstances sheds no light on whether a product-liability plaintiff should be allowed to pursue alternative negligence and strict liability claims in the first instance.  *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1231 (10th Cir. 2004) ("[C]ases are not authority for propositions not considered.") (internal quotation marks omitted).

Nor does *Golonka* cast any doubt on *Gomulka*'s prior holding that a negligence claim should be deemed redundant in such circumstances.  Indeed, *Golonka* approvingly

cited *Gomulka* as standing for the proposition that "if plaintiff cannot prove his design defect case in strict liability he cannot prove it in negligence."  *Golonka*, 65 P.3d at 964.  *Golonka* also cited, with approval, the provision of the Restatement (Third) of Torts that is discussed above.  *Id.* at 965 n.3.  Finally, the outcome in *Golonka* also dispels any suggestion that Dehart would suffer prejudice from the dismissal of her negligence claim.  She, like the plaintiffs in *Golonka*, has asserted strict liability claims for both design defect and failure to warn, and in *Golonka* it was the presence of the plaintiffs' verdict on the "strict liability information defect" claim that helped stave off the defendant's request for judgment notwithstanding the verdict.  Accordingly, *Golonka* does not provide a basis for denying Defendants' motion to dismiss Count I.

The other case on which Dehart relies is *Granillo*.  It is true that, in *Granillo*, the court interpreted *Golonka* as supporting an Arizona product-liability plaintiff's right to pursue alternative negligence and strict liability theories at trial.  2020 WL 913300 at *2 ("[T]he *Golonka* case, decided more than 15 years after *Gomulka*, belies Defendants' argument; that case involved a trial on both strict liability design and negligent design theories.").  Nevertheless, for the reasons set forth above, the Court respectfully reaches a different interpretation of the interplay between *Gomulka* and *Golonka*—the *Golonka* court's observation that the plaintiffs in that case were allowed to pursue duplicative negligence and strict liability claims at trial is not the same thing as a holding that other product-liability plaintiffs should be allowed to pursue the same approach.

For these reasons, Count I is dismissed.

### 2.   Negligent Infliction Of Emotional Distress ("NIED")

Count X of the FAC asserts a claim for "Negligent Infliction of Emotional Distress." (Doc. 15 ¶¶ 248-59.)  Defendants seek dismissal of this claim on two grounds: (1) like the negligence claim in Count I, it is subsumed by Dehart's strict liability claims; and (2) the FAC also to plead "facts that could plausibly establish other essential elements of this cause of action"—specifically, it does "not plead any facts that would show that [Dehart] has sustained severe emotional distress" resulting in illness or bodily harm.  (Doc. 16 at 9-10.)

1    The Court agrees with Defendants' second argument and thus does not reach the

2    first.  Under Arizona law, "[d]amages for emotional disturbance alone are too speculative"

3    to support "recovery for the tort of negligent infliction of emotional distress.  *Keck v.*

4    *Jackson*, 593 P.2d 668, 669-70 (Ariz. 1979).  Instead, "the Arizona cases and Restatement

5    § 436A make clear that a physical injury, as well as a long-term physical illness or mental

6    disturbance, constitute[] sufficient bodily harm to support a claim of negligent infliction of

7    emotional distress."  *Monaco v. HealthPartners of S. Ariz.*, 995 P.2d 735, 739 (Ariz. Ct.

8    App. 1999).  Here, the theory underlying Dehart's NIED claim is that Defendants' conduct

9    has caused Dehart to "reasonably fear[] for her own safety due to the TVT-S product

10   implanted in her" and to "suffer[] constant threats to her own personal security as long as

11   Defendants' TVT-S device remains implanted in her."  (Doc. 15 ¶ 254.)  Although the FAC

12   goes on to assert that such fears have caused Dehart to "sustain[] physical injuries,

13   including but not limited to pain and suffering, that were caused by psychological trauma

14   (stress, anxiety, sadness, anger, etc.) related to the Defendants' above-referenced conduct"

15   (*id.* ¶ 256) and that Dehart's "emotional distress was an is so severe" that it "was medically

16   diagnosable" (*id.* ¶ 257), these allegations are too conclusory to suffice.  At most, the

17   factual allegations in the FAC establish that Defendants' conduct caused Dehart to suffer

18   an emotional disturbance.  They do not, in contrast, establish that Dehart sustained the sort

19   of physical injury, long-term physical illness, or mental disturbance required by Arizona

20   NIED law.

21         For these reasons, Count X is dismissed.

22         **C.    Misrepresentation-Related Claims**

23         The FAC includes four claims that are premised, in one way or another, on the

24   presence of misrepresentations: common law fraud (Count V); constructive fraud (Count

25   VIII); negligent misrepresentation (Count  IX); and violation of Arizona Consumer Fraud

26   Act ("ACFA") (Count XI).

27         …

28         …

1                    1.    Global Challenges

2           As an initial matter, Defendants seek dismissal of all of Dehart's misrepresentation-

3    related claims on the ground that they "fail for the same reasons . . . [as] Plaintiff's failure

4    to warn claims."  (Doc. 16 at 13.)  But as discussed in Part II.A.3 above, Defendants'

5    challenges to Count IV are unavailing.

6           Alternatively, Defendants seek dismissal of all of Dehart's misrepresentation-

7    related claims due to alleged non-compliance with Rule 9(b)'s heightened pleading

8    standard.  (Doc. 16 at 13-15.)

9           "Rule 9(b) demands that, when averments of fraud are made, the circumstances

10   constituting the alleged fraud [must] be specific enough to give defendants notice of the

11   particular misconduct . . . so that they can defend against the charge and not just deny that

12   they have done anything wrong."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106

13   (9th Cir. 2003) (internal quotation marks and citation omitted).  This requires a plaintiff to

14   plead "the who, what, when, where, and how of the misconduct charged" and "set forth

15   what is false or misleading about a statement, and why it is false."  *Id.* (internal quotation

16   marks and citation omitted).

17          Dehart argues that Rule 9(b)'s particularity requirement should be relaxed in this

18   case due to her limited ability to ascertain information in Defendants' possession.  (Doc.

19   17 at 10-12.)  The Court disagrees.  It is true that "Rule 9(b) may be relaxed to permit

20   discovery in a limited class of corporate fraud cases where the evidence of fraud is within

21   a defendant's exclusive possession."  *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245

22   F.3d 1048, 1052 (9th Cir. 2001) (citation omitted). However, the FAC acknowledges that

23   Dehart has already obtained "substantial prediscovery evidence," "much of which was

24   obtained from the general discovery already concluded in the underlying multi-district

25   litigation pending in the Southern District of West Virginia, 2:12-md-02327."  (Doc. 15

26   ¶ 149.)  Although Dehart apparently views these circumstances as supporting her request

27   for relaxation of Rule 9(b)'s requirement, the Court views them as cutting in the opposite

28   direction—because Dehart was given pre-filing access to the discovery materials on which

a fraud or misrepresentation claim might be based, she should not be excused from Rule 9(b)'s requirement of identifying the particular details as to the time, place, and content of the allegedly fraudulent statements and misrepresentations. *Compare Deutsch v. Flannery*, 823 F.2d 1361 (9th Cir. 1987) ("Rule 9(b) does not . . . require plaintiffs in a securities fraud case to set forth facts which, *because no discovery has yet occurred*, are in the exclusive possession of the defendants.") (emphasis added and citation omitted).

Nevertheless, on the merits, the FAC's allegations are sufficient to survive dismissal under Rule 9(b). The theory underlying Dehart's fraud- and misrepresentation-based claims is that Defendants and their agents made inaccurate statements related to TVT-S's high risk of adverse effects. In support of that theory, the FAC specifically identifies two instances in which allegedly false representations were made to Dr. Koon. First, the FAC alleges that "immediately before and during [Dehart's] implantation procedure," "a sales representative" affiliated with Defendants made statements that TVT-S is "safe and effective", "does not cause chronic conditions," and "does not degrade or otherwise deform." (Doc. 15 ¶ 57.) Second, the FAC alleges that "these representations were [also] made by one of Defendants' sales representatives when [Dr. Koon] purchased the TVT-S product for the very first time." (*Id.*) Although these allegations do not identify the sales representatives by name and do not identify the precise format in which the representations were made, the Court is satisfied that they are sufficiently particular to satisfy Rule 9(b).[6]

---

[6] *See, e.g., Arvizu v. Medtronic Inc.*, 41 F. Supp. 3d 783, 791 (D. Ariz. 2014) ("Defendants argue that Plaintiffs have failed to meet [Rule 9(b)'s] pleading requirements, but the Court does not agree. Plaintiffs have alleged who made representations about the Infuse Device as well as when and where the representations were made, and they have alleged that, as a result of these representations, Mr. Arvizu's physician used the Infuse Device in an unsafe manner, resulting in harm to Plaintiffs. These allegations are sufficient to 'give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong.'") (citations omitted); *Scovil v. Medtronic, Inc.*, 995 F. Supp. 2d 1082, 1097 (D. Ariz. 2014) ("Plaintiffs have pled facts sufficient to satisfy Rule 9(b). Plaintiffs allege that Defendants and their agents engaged in a campaign to convince doctors of the safety of the Infuse device for uses that the FDA did not approve and which Defendants knew were unsafe based on studies that they allegedly hid from doctors and that, as a result of these representations, Plaintiffs' doctors used the Infuse device in a manner that was unsafe and caused them harm."); *Susilo v. Wells Fargo Bank, N.A.*, 2011 WL 2471167, *10 (C.D. Cal. 2011) (motion to dismiss denied where the "only arguable deficiency in plaintiff's allegations of fraud is that [they] did] not state the names of all the individual representatives of defendants").

1

2.      Individual Challenges

2

a.      **Negligent Misrepresentation**

3       Defendants contend that Dehart's claim in Count IX for negligent misrepresentation

4    fails for the additional reason that such a claim "requires justifiable reliance," and

5    "[b]ecause [Dehart] was not a party to the transaction, [she] cannot plead facts that could

6    plausibly show that she justifiably relied on any assertion by Defendants."  (Doc. 16 at 14.)

7       This argument is unavailing.  The only case that Defendants cite in support of their

8    challenge is *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808 (Ariz.

9    1987)  There, the Arizona Supreme Court limited the scope of justifiable reliance for

10   negligent misrepresentation to "foreseeable user[s] of information supplied in connection

11   with commercial transactions."  742 P.2d at 814.  However, the court went on to explain

12   that "[o]ften the foreseeable user of the information is the person who contracted with its

13   supplier and paid the supplier consideration, in this case, the patient."  *Id.*

14      Here, the FAC alleges that Dehart paid consideration through her supplier, Dr. Koon

15   or the hospital (Doc. 15 ¶¶ 179, 211); that Dehart and Dr. Koon "justifiably acted or relied

16   upon, to her detriment, the misrepresented, concealed and/or non-disclosed facts as

17   evidenced by her purchase of Defendants' TVT-S pelvic mesh product" (*id*. ¶ 54; *see also*,

18   *id*. ¶¶ 69, 89, 156, 163, 175, 204, 210, 235, 244); and that Defendants concealed their

19   limited clinical testing and problematic characteristics of TVT-S and "represented the

20   opposite to her and Dr. Koon" (*Id.* ¶ 57, 205, 222).  These factual allegations suffice to

21   establish that Dehart was a "foreseeable user" of the information supplied by Defendants.

22

b.      **Constructive Fraud**

23      Defendants contend that Dehart's claim in Count VIII for constructive fraud fails

24   for the additional reason that such a claim requires proof of a fiduciary or confidential

25   relationship, which was lacking here.  (Doc. 16 at 14.)

26      Under Arizona law, a claim for constructive fraud must "aris[e] out of a fiduciary

27   or confidential relationship."  *In re McDonnell's Estate*, 179 P.2d 238, 241 (Ariz. 1947).

28   *See also Rowe v. Bankers Life & Casualty Co.*, 2008 WL 5156077, *7 (D. Ariz. 2008)

("[T]o prevail on a claim on constructive fraud, [plaintiffs] must prove these elements: (1) Defendants had a fiduciary or confidential relationship with Plaintiffs that gave rise to a legal or equitable duty; (2) Defendants breached that duty; (3) the breach tends to deceive others, violates public or private confidences, or injures public interests; and (4) the breach induced detrimental and justifiable reliance.") (citation omitted).

The Court agrees with Defendants that the FAC is insufficient to state a claim under these standards.  To be clear, the FAC *attempts* to allege the existence of a fiduciary or confidential relationship—in paragraph 211, it alleges that "there exists a confidential and/or fiduciary relationship between [Dehart] and Defendants, by virtue of the contract between Defendants and Dr. Koon or hospital for the purchase of [TVT-S]," and in paragraph 212, it alleges that "[a] fiduciary relationship between the parties is established by and through the relationship between [Dehart] and her implanting physician."  But these allegations are too conclusory to suffice.  As for paragraph 211, it simply alleges the existence of a contract to purchase a medical device.  Such a contract does not create a fiduciary relationship.  As Arizona courts have explained, "[a] fiduciary relationship has been described as something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise.  Further, mere trust in another's competence or integrity does not suffice to create a fiduciary relationship.  Rather, the relation of the parties must be such that one is bound to act for the benefit of the other and may be characterized by great intimacy, disclosure of secrets, or intrusting of power." *Cook v. Orkin Exterminating Co.*, 258 P.3d 149, 152 (Ariz. Ct. App. 2011) (cleaned up).  Significantly, it is "[g]enerally" the rule that "commercial transactions do not create a fiduciary relationship unless one party agrees to serve in a fiduciary capacity." *Id.*  Meanwhile, although paragraph 212 may allege the existence of a fiduciary, confidential relationship between Dehart and Dr. Koon, he isn't the one being sued in this case.  To prevail on a constructive fraud claim against Defendants, Dehart must establish that she had a fiduciary or confidential relationship with them.  The factual allegations in the FAC do not plausibly establish such a relationship.

1   For these reasons, Count VIII is dismissed.

2       D.   **Breach Of Express Warranty**

3       Count VI of the FAC asserts a claim for "Breach of Express Warranty." (Doc. 15

4   ¶¶ 168-84.)  Defendants seek dismissal of this claim for three reasons: (1) it is barred by

5   the statute of limitations; (2) the FAC "fail[s] to identify any specific affirmation of fact

6   made to [Dehart] that became the basis of the bargain"; and (3) the FAC fails to plausibly

7   allege causation.  (Doc. 16 at 10-12.)

8       The Court agrees with Defendants' first argument and thus does not reach their

9   remaining arguments.  Defendants contend, and Dehart doesn't dispute, that a claim for

10  breach of express warranty is governed by A.R.S. § 47-2725, which generally establishes

11  a four-year statute of limitations.  (Doc. 16 at 11; Doc. 17 at 9.)  Defendants further contend,

12  and Dehart doesn't dispute, that the device was implanted in June 2009, "more than seven

13  years before [Dehart's] claims were deemed filed on February 23, 2017 pursuant to a

14  previously negotiated tolling agreement."  (*Id.*)  Dehart's only response to Defendants'

15  statute-of-limitations argument is to cross-reference the paragraphs of the FAC in which

16  she attempts to invoke the discovery rule and the doctrine of equitable tolling.  (Doc. 17 at

17  9, citing Doc. 15 ¶¶ 73-75, 171.)

18      The difficulty with the cross-referenced portions of the FAC is that they are devoid

19  of non-conclusory factual allegations establishing *why* Dehart's breach-of-warranty claim

20  should be deemed timely pursuant to the discovery rule and/or the equitable tolling

21  doctrine.  For example, in paragraph 73, the FAC alleges that "the discovery rule should

22  be applied to toll the running of the statute of limitations until [Dehart] knew, or through

23  the exercise of reasonable care and diligence should have known, of facts indicating that

24  Plaintiff had been injured, the TVT-S product's defective and unreasonably dangerous."

25  However, the FAC doesn't go further and allege the date on which Dehart actually obtained

26  (or should have obtained) such awareness.  A generic statement about how the discovery

27  rule might hypothetically apply in a hypothetical case is insufficient to plausibly establish

28  that Dehart's breach-of-warranty claim in this case should be deemed timely under A.R.S

§ 47-2725.

Next, in paragraph 74, the SAC alleges that "[d]espite diligent investigation by Plaintiff into the cause of her injuries, including consultations with her medical providers, the nature of Plaintiff's injuries and damages, the TVT-S product's unreasonably dangerous conditions, and her relationship to the TVT-S product was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims conditions, the cause of her injuries, and the tortious nature of the wrongdoing that caused her injuries." This is a conclusion, not an assertion of fact—saying that the relevant discovery occurred on an unspecified date "within the applicable statute of limitations," when the limitations period is four years long, is too conclusory to suffice.

Similarly, in paragraph 75, the FAC alleges that "[t]he running of the statute of limitations in this cause is tolled due to equitable tolling" and that "Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment, through past and continuing affirmative misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the true and material risks, adverse events, and contraindications associated with the TVT-S product. As a result of Defendants' fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants." These allegations are deficient for the same reasons as the previous ones—they are generic and devoid of specifics.

Finally, in paragraph 171, the FAC alleges that Count VI should be deemed timely because "Defendants warranted that their TVT-S product is a permanent implant, *i.e.,* it is safe and effective and will cure or alleviate [Dehart's] SUI for her entire life" and Dehart did not "discover[] Defendants' breach [until] when she was scheduled for a mesh excision/revision procedure." These allegations appear to be intended to trigger A.R.S. § 47-2725(B), which provides that "where a warranty explicitly extends to future

- 22 -

1   performance of the goods and discovery of the breach must await the time of such

2   performance the cause of action accrues when the breach is or should have been

3   discovered."   Because paragraph 171 alleges that Defendants provided such a "future

4   performance" warranty and that Dehart didn't discover the breach of the warranty until she

5   was scheduled for a mesh excision/revision procedure, it follows that *if* the scheduling

6   process occurred within four years of when Dehart filed suit, her claim would be timely.

7   Unfortunately for Dehart, the FAC doesn't allege the date of the scheduling process.

8   Without this information, Dehart cannot plausibly allege that her claim falls within the

9   statute of limitations.

10          For these reasons, Count VI is dismissed.

11          **E.    Unjust Enrichment**

12          Count XII of the FAC asserts a claim for "Unjust Enrichment."  (Doc. 15 ¶¶ 284-

13   94.)  Defendants seek dismissal of this claim for two reasons: (1) Dehart's remedy lies

14   solely in tort; and (2) the FAC's allegations are deficient because Dehart "has not pled

15   sufficient facts to plausibly show that [the product] was unsafe" or "ineffective" and has

16   not alleged "how much she paid."  (Doc. 16 at 15-16.)

17          The Court declines to dismiss Count XII on either of these grounds.   As for

18   Defendants' first argument, it is premised on the notion that the remedy of unjust

19   enrichment is available only in contract cases and never in tort cases.  Defendants' limited

20   briefing, however, does not identify any Arizona decision announcing such a categorical

21   rule.  To the contrary, Arizona courts have characterized unjust enrichment as a "flexible"

22   remedy that is "available when equity demands compensation for benefits received, even

23   though the party has committed no tort and is not contractually obligated to the other."

24   *Wang Electric, Inc. v. Smoke Tree Resort, LLC*, 283 P.3d 45, 49 (Ariz. Ct. App. 2012)

25   (cleaned up).  Thus, although Defendants may very well be able to establish, at a future

26   stage of this case, why Count XII should be rejected, they have not done so yet.   *Cf.*

27   *GlobalTranz Enterprises Inc. v. Shipper's Choice Glob. LLC*, 2017 WL 11609546, *9 (D.

28   Ariz. 2017) (finding that Plaintiff "is permitted to plead in the alternative" and "while

[Plaintiff's] unjust enrichment claim may be precluded should it prevail on some of its other claims, the Court cannot dismiss a claim at the motion to dismiss stage merely because it might be precluded later").

As for Defendants' second argument, the Court has already rejected, in other portions of this order, Defendants' challenges to the sufficiency of the FAC's allegations regarding why the product is unsafe and ineffective.  Finally, although the FAC does not specifically allege the amount of money Dehart paid for the device, Defendants have not established that such information must be alleged to avoid dismissal.  Under Arizona law, a plaintiff asserting an unjust enrichment claim must establish, *inter alia*, "an enrichment, . . . an impoverishment, [and] a connection between the enrichment and impoverishment." *Wang Electric*, 283 P.3d at 49 (citation and internal quotation marks omitted).  Here, the FAC alleges that Dehart "paid for Defendants' TVT-S product," that "Defendants accepted payments from [Dehart] and/or others on [Dehart's] behalf for the purchase of Defendants' TVT-S product," and that Dehart "has not received the safe and effective TVT-S for which she paid."  (Doc. 15 ¶¶ 286-87, 291.)  Such allegations are sufficient to establish the enrichment and impoverishment elements of an unjust enrichment claim.

F.     **Punitive Damages**

Count XIII of the FAC asserts a claim for "Punitive Damages."  (Doc. 15 ¶¶ 295-314.)  Defendants seek dismissal of this claim for two reasons: (1) "it is derivative of [Dehart's] underlying claims which should be dismissed for the reasons set forth above"; and (2) it is barred by A.R.S. § 12-689(A)(1), which precludes the imposition of punitive damages in a product liability action (absent exceptions that are inapplicable here) if the product was designed, manufactured, packaged, labeled, or sold according to the terms of an approval by a government agency.  (Doc. 16 at 16-17.)  In response, Dehart argues, among other things, that choice-of-law principles compel the application of New Jersey law (rather than Arizona law) to her claim for punitive damages.  (Doc. 17 at 13-14.)  In reply, Defendants do not attempt to address the merits of Dehart's choice-of-law argument and simply contend that, "[i]f the Court determines that any of Plaintiff's claims survive

1  dismissal, then the Court may consider the parties' other arguments related to punitive
2  damages (including choice of law) at a later date."  (Doc. 19 at 9.)

3      In the preceding sections of this order, the Court has determined that some of
4  Dehart's claims survive dismissal (which, in turn, undermines Defendants' first challenge
5  to the punitive damage claim).  And because Defendants clarify in their reply that any other
6  dismissal arguments may be resolved at a later stage of this case, Count XIII will not be
7  dismissed at this juncture.

8      G.      **Leave To Amend**

9      Dehart seeks leave to amend in the event of dismissal.  (Doc. 17 at 14.)

10      Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the Court
11  "should freely give leave [to amend] when justice so requires."  The Ninth Circuit has
12  emphasized that "[t]his policy is 'to be applied with extreme liberality.'"  *Eminence*
13  *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted).  Thus,
14  leave to amend should be granted unless "the amendment: (1) prejudices the opposing
15  party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."
16  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).  "An
17  amendment is futile when 'no set of facts can be proved under the amendment to the
18  pleadings that would constitute a valid and sufficient claim or defense.'"  *Missouri ex rel.*
19  *Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (citation omitted).

20      Here, the Court has determined that the following six claims are subject to dismissal:
21  (1) Count I (negligence); (2) Count III (strict liability—manufacturing defect); (3) Count
22  VI (breach of express warranty); (4) Count VII (strict liability—breach of implied
23  warranty); (5) Count VIII (constructive fraud); and (6) Count X (negligent infliction of
24  emotional distress).  Only one of those claims (Count VII: strict liability—breach of
25  implied warranty) is being dismissed for legal reasons that could not be cured by the
26  addition of more factual allegations.  Thus, as to that claim, leave to amend is denied on
27  futility grounds.  As for the remaining claims, leave to amend is granted because it is
28  possible that the addition of more factual allegations could cure the deficiencies.

1    Accordingly,

2    **IT IS ORDERED** that Defendants' motion to dismiss (Doc. 16) is **granted in part**

3    **and denied in part.**

4    **IT IS FURTHER ORDERED** that Dehart may file a second amended complaint

5    ("SAC") within 14 days of the issuance of this order.  If Dehart files a SAC, the changes

6    shall be limited to attempting to cure the deficiencies raised in this order, and Dehart shall,

7    consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

8    Dated this 27th day of September, 2021.

9

10

11                                          _____

12                                          Dominic W. Lanza
                                            United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28